I guess I'm up here. Let's just keep going. I don't know if the court. You want to go get some water, sit down, stretch? I think I can do it, Your Honor. If the court doesn't need a break, I think I can keep going. OK, Grant. I'm going to, I'm just going to keep going with the argument. And of course, please tell me if there's something I've not addressed that has not already been addressed. There are arguments that are common to all three of the cases, and we understand that there are arguments that are specific to each of the cases. So however you want to structure the argument is fine with us. Well, I want to make sure I'm responding to the court's questions. I agree with everything that Mr. Savitsky said about the numbers. I also want to say, as we said in our brief, for the Grant case, there are, you know, I said 50,000 plus in the Pendergrass case, in the congressional case. In the Grant case, there are 185,000 plus black voters who have suffered a vote dilution injury that the state actively chose not to provide a vote dilution remedy, because they decided to go outside to voters who had not proven a vote dilution injury and give it to them instead. It was a shell game. Black voters here, black voters there. It's generally the same. Let's call it a day, because it all adds up to some rough math. That is the absolute strategy that Texas tried in Lula v. Perry and that the Supreme Court struck down. In the House, I believe that number is more than 57,000 of injured black voters proved a vote dilution injury and that remain injured. Going on to the legal theories, and we'll continue. Same question. How many of them got relief under your definition? I think what we said, I don't have the numbers handy, Your Honor, but I believe what we say in our brief is that that's, I think, some hundreds of thousands, 300,000 maybe. I'm being very rough here. I don't have an exact number for you. And I know you don't want to put a number on it, but you're talking about 75% relief, roughly, right? I'm talking about a district that is 75% or so overlapping with the actual vote dilution. That the voters who were affected by vote dilution of that group, 75% of them, roughly, 70%, 75%, 80% in this example, got Section 2 remedial relief. Without conceding the exact numbers or anything, I want to acknowledge that I might not have exact or even rough numbers exactly right. Certainly, some black voters who had a right, who had a violation, saw a remedy. OK. Is there, and I don't want to hold you to any numbers either in an oral argument like this one. More, you say 185,000 in your example didn't get any Section 2 relief. Did the same number or more than that number get relief? I think probably the same or more, probably. Yeah, not some minimal number. But those 185,000 who didn't, they were replaced by black voters elsewhere. And the district and the state finds it good enough to treat them the same. The district court deferred, understandably wanting to defer, but in so doing, abdicated the remedial authority that it has, which is to hold the state to account. This is not a first look at a legislative map to see whether or not there's a violation. In all the deference that entails, this is the second look of a remedy map. But we're not looking abstractly at Section 2 and what it requires. We're also looking at Section 2 in conjunction with the district court's injunctive merits order and what it required, right? Absolutely, Your Honor. And that is exactly our point. The very robust injunctive relief that the district court ordered and the liability that it found, which was extremely thorough and thoughtful and specific. It wasn't vague generalizations about plus one is good enough. It was specific about who is suffering, how they're suffering, why they're suffering, and that that needs to be remedied. And that there was a mismatch once we got to a 15-page remedy ruling, which said, it's generally there. It's generally in the same area. There's overlap. It's not completely different in a completely different area. It quoted that part of Shaw. It's not as egregious as Shaw. Also, there's deference. There's deference. Rucho said they can meet their political aims. And that was an abdication of the district. That understandable desire to give some leeway turned into an abdication of the district court's obligation to hold the state to account on a remedy. Now, the state would like this court to think that legislative discretion is boundless at any stage. And it really does conflate that kind of discretion that the court's language is used when talking about liability in the first instance versus when talking about remedies. Courts, time and again, have said that that discretion, it doesn't get stamped out, but it is certainly cabined once there has already been a violation found. In the Covington versus North Carolina case, the court said, this remedial posture impacts the nature of our review. While we otherwise would have, you that the districting scheme is valid and entitled to judicial deference, the district court need not defer to a state-proposed remedial plan if it does not completely remedy the violation. In Jeffers versus Clinton, quote, at the remedy stage, courts should not be grudging in remedying injustice. Equity delights to do justice and not by halves. And just last week, Your Honors, in Allen v. Milligan, out of Alabama, in which the Supreme Court affirmed the Section 2 violation and the Section 2 standard in a very extensive opinion that we have available, if the court would like, that just came out last week. That court on remedy specifically made this decision, made the distinction between what they called a round one case, which is a case that involves the legislature's first attempt to redistrict after receiving new census data, free of judicial intervention, and what this case is, a round two case, a case that involves the legislature's second attempt to redistrict after a federal district court order has explained a violation and required the remedy of an additional opportunity district. And the idea, notably, Your Honor, the state relies primarily on Section 2 round one decisions in deciding that it has endless deference. The district court made the same mistake. At no point does either the state or the district court grapple with the Supreme Court and 11th Circuit's requirements for complete remedies, for full remedies, for remedies designed as nearly as possible to remedy the wrongs suffered by the victims of the state's discriminatory maps. In fact, while the state, in its brief, I think on the grant brief on page 24, it cites to Clark versus Calhoun County out of the Fifth Circuit as holding that the state is free to develop a remedial plan different from those of the proposed by the plaintiff. Notably, the state writes out a key part of that passage. The actual quote is the state is free within limits to develop a different remedial plan. It also includes a footnote of what those limits are. If the board of supervisors in that case failed to develop a plan which fully remedies the current vote dilution, the responsibility falls on the district court. This is not a do-over. The legislature did not win a gimme, a chance to start from square one again. They were given the opportunity to right the wrong that they had created. And they chose not to do that, or they chose, at best, to kind of do it, and to get this court and the district court to be on board with the idea that a kind of, sort of, general, mostly, remedy is good enough. That is not the legal standard. What about the deference to the district court in its order, and what the order required, and what the legislature did? Well, I want to be very clear that there's two distinct claims here. So we have our main argument, our primary argument, is that there was a fundamental legal error, no deference to the district court, when it comes to the failure to interrogate whether an actual, full, and complete remedy was provided to the black voters in the vote dilution area, irrespective of anybody else. So that's a legal error. A second question, this court doesn't have to reach it, but if- What does the case you have, anywhere, for the proposition that you have to provide the relief to the voters who suffered the section two violation? Lulak, Shaw, Marbury v. Madison, Covington. Marbury v. Madison. Marbury v. Madison said there is no remedy if there's not a right. I'm not that old, okay? But I agree with Marbury being a redistricting case. It's definitely not a redistricting case, Your Honor, it just stands for the fundamental principles that the remedy must be tied to the right. And so that is a fundamental precept that in the redistricting context, it has been proven in Shaw, in Lulak, in Covington, in Clark, in Dallas County, to name a few. Let me ask you a more granular question about cases. What case stands best for the proposition that the relief has to be for the individual voters affected by the section two violation? That case is saying there has to be a complete remedy. Shaw and Lulak, Your Honor. Shaw and Lulak say that the remedy has to be to those who would suffer a vote dilution injury. Now, the fact that Shaw and Lulak were more egregious does not undermine their fundamental basic holding that you do not get to swap out, trade out the rights of some black voters who actually have an injury for other minority voters who don't have an injury. All right. Thank you very much. Thank you, Your Honor. Thank you, Your Honors. There isn't much new for me to say, so I'll just address a few broader points. Well, she's right about one point, right, that the discretion given to the legislature still exists, but it's not the same when you've got a remedial injunctive order that it has to comply with, right? Well, the discretion is only different to the extent that it has to stay within the terms of that order. So, so... It's not that you don't have the initial broad-based general discretion to do as you think. Yes, no, exactly. But this was one of the... It's not possible to offer that. Sure, Your Honor, but this is one of the points I wanted to make was, first of all, they're the ones arguing that we violated the district court's order, and the district court said, no, you didn't. So that's a pretty tough hill to climb. But also, let's look at what the district court's order said. It said nothing about having to put specific voters in any specific districts. It just said on page 509 that we needed an additional majority black congressional district in West Metro Atlanta, two in South Metro Atlanta, two in South Metro Atlanta for the House, one additional House in West Metro Atlanta, and two in and around Macon-Vibb. That's what it said. It did not say you need to put these specific voters in or those specific voters in or anything like that. And so the idea that somehow we're in this fundamentally different position than we were before the order in terms of complying with Jingles, just, I mean, it's a slightly different position. We had to put the number of districts that the court said were required, and we did. That's what we did. And the opposing counsel said the remedy must be tied to the right. Well, yes. So the right is to a certain number of majority-minority districts. The right is not to be in a majority-minority district. This entire time, not heard any response to that basic point. When they say that, oh, you didn't remedy the wrong, that's because they're assuming that the remedy must be you put me in a black-majority district, but that's just not right. The right is to a certain number of majority-black districts, not to be necessarily personally in one of them. That's why this completely and fully remedies the Section 2 violation that the district court found, because it is about districts. It's not about individual voters being in particular districts. And I also point out that this plaintiff's counsel referred to Allen v. Milligan. They talk a lot about Allen v. Milligan in their briefs, and on one hand, I understand why, because it was a case where a state lost, and so they want to try to make the court think that this is similar. This is literally the opposite of Allen v. Milligan. In that case, the district court said, you need an additional majority-black district, and the state did not create one. And then the district court said, you didn't create one, what the heck are you doing? In this case, the district court said, you need these additional majority-black districts, and we did create them, and the district court said, yeah, you did it, good job. I mean, we could not be further from Allen v. Milligan land. I've been up here for a while. I'm happy to answer any questions that the court has, but otherwise, I'm happy to see the rest of my time as well. Do you have an approximation for the numbers of, I know your position is that the right is not to be placed in, for purposes of this case, a black-majority district. Nevertheless, do you know the numbers for the quote-unquote affected black voters who were placed in black-majority districts? So we do. Black-majority voters who were not. Yeah, so it's two basic points there. The first is, we do have those numbers in our briefs using what they call the vote dilution zone, and if you look at the House districts, I believe it's roughly 54%, up to 74% of the black voters in the vote dilution zone. I could be wrong about that. The right numbers are in the briefs. There are a lot of numbers, and I don't want to give you the wrong ones. But we can test the idea that the quote-quote vote dilution zone is the relevant area. As the district court said, it shows you the basic area, which is South Metro Atlanta. I mean, we take that to be basically roughly I-20 and everything below, from west to east, and that's not synonymous with the vote dilution zone. So I do believe those numbers exist, and I think I just have the right ones, but if I don't, I apologize, and they are in our briefs, to the extent that Your Honor is interested. I think it's fair to say there's some confusion, or maybe just variability in how we view the numbers. My co-counsel for the Alpha Phi Alpha plaintiffs informs me that the number, I believe, that Your Honor is looking for in the Senate is 3,000 black voters who were provided a remedy, and in the House is 15,000 black voters. Compared to the 2021 map. So an additional 3,000. For me, in trying to get my head around all of these things, the wrong number on one side doesn't give me an idea. I need a comparator. So for example, your argument would be very different, in my opinion, if you had 5,000 affected voters, and the state put 4,995 of them in a black majority district, and excluded five.  I'd be like, your mom's loose, because that's pretty close to an almost complete remedy. So if you're giving me one number, I need the other number to compare. I understand, Your Honor, and unfortunately, I can't give you the exact, the numbers, I believe, are in the briefs, and I know that they're in the exhibits. I wasn't asking anybody to remember everything from memory. It is absolutely not the case, however, that we're talking about the hypothetical that Your Honor just posed. We're talking about orders of magnitude in the tens to hundreds of thousands of black voters. So this is not about a de minimis number. This is not about one. Hundreds of thousands means nothing to me, abstractly, without knowing the other number. If you're talking about 20,000 excluded, but, and again, I know I'm making up numbers, but it's just to make a point. If you're talking about 20,000 excluded, but 800,000 included, the 20,000 carries less weight. If you're talking 20,000 and 30,000, different story. I understand, I understand. Fair enough, Your Honor. I think I understand what you're saying, and I think Your Honor understands what I am saying, which is that it is a substantial number of voters who are left in the cold, despite having proven a right. And whether that number is 15%, 25%, or 80% of the denominator, there's no justification for leaving voters in the cold. There's no justification that they can even offer. They don't pretend to offer one. For providing it to people who never had a right to begin with, and for treating all black voters in the general area as fungible, that is exactly what they were not allowed to do based on LULAC. Your Honor asked specifically about what case law are we relying on for the legal standard on remedy. I mentioned a number of cases. I've mentioned Shaw, I've mentioned LULAC, and I want to call attention to one particular passage about the legal standard on remedy from North Carolina versus Covington. 581 U.S. 486 at 488. That relief in redistricting cases at the remedy stage is grounded in equity. A district court, therefore, must undertake an equitable weighing process to select a fitting remedy for the actual legal violations it has identified, taking into account what is necessary, what is fair, and what is workable. And the remedial maps here fail on all counts. Equity comes with discretion, too. Equity comes with discretion, but you cannot, that is true, but equity also requires not arithmetic that my fourth grader can do. It requires a weighing and an analysis of the meaningful, functional, practical relief and whether it has been afforded here. And to the extent there is a difference between the House map and the Senate map, the Congressional map, between the numerators and the denominators, that's an inquiry that the district court can and should do on remand. But what it cannot do is say, eh, it's probably fine out of deference. I have an understandable desire to defer, but in a posture that does not warrant that level of deference where we have shown the state has failed to provide to meet its standard. It has certainly not shown that the remedies are necessary. It has certainly not shown that its remedies are fair. And they've absolutely not shown that the remedies are fitting, where the remedies are disentangled and divorced from the right. They are not fitting. And it is their responsibility to develop a functional and meaningful relief for Section 2. The district court's order and the instructions it provided in its liability required a meaningful remedy to a Section 2 violation. It was not an opening bid subject to negotiation, nor was it a chess move that could be checkmated by a clever opponent. That's what Voting Rights Act litigation has been time and time again, and it's precisely why the standard is so high. What the district court provided the state legislature was an opportunity to right the wrongs that it had imposed on certain black voters in Georgia. In West Metro Atlanta and various areas of that map, nothing more and nothing less. As the Supreme Court recognized in DeGrande, Section 2 was enacted to put an end to states' demonstrated ingenuity in hobbling minority voting power. It would be anathema for this court to find that the Section 2 rights of black Georgians can be so needlessly skirted, reducing Section 2 to little more than a paper promise for those exact voters who it was designed and proven to protect. Ultimately, the state's only argument and best argument, Your Honor, is that it didn't completely fail to provide a remedy. It didn't do as bad a job as Shaw. It didn't do as bad a job as Lulac. But that they get no blue ribbons for not completely falling. A B-minus is not gonna be a win here where the actual remedial standards requires near perfection and certainly as nearly as possible given all the constraints. Thank you, Your Honors. Thank you, Your Honors. Very helpful. We will await the merits decision from the panel and then get to work on this. Thank you very much. We're in recess for today. Rise.